## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES RICE KENDALL and
ANN P. HOCHBERG, as Trustees for
The Thomas E. Proctor Heirs Trust,

                Plaintiffs,

    v.

ALTA MARCELLUS DEVELOPMENT,
LLC, ARD OPERATING, LLC,
INTERNATIONAL DEVELOPMENT
CORP., and SWN PRODUCTION
COMPANY, LLC,

              Defendants.

CIVIL ACTION No.


JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Charles Rice Kendall and Ann P. Hochberg, the Trustees of the Thomas E. Proctor Heirs Trust (the "PHT"), for their Complaint against Defendants Alta Marcellus Development, LLC, ARD Operating, LLC, International Development Corp., and SWN Production Company, LLC, aver the following:

1.    Plaintiffs and Defendants have a dispute as to the title to the subsurface estate of 44 tracts of land located in Lycoming County and Sullivan County.  Therefore, Plaintiffs seek a determination that the PHT owns the oil, gas, and mineral rights to these 44 tracts.

## THE PARTIES

2.      The PHT is a trust for the benefit of numerous heirs of Thomas E. Proctor, Sr. whose current trustees are Ann P. Hochberg and Charles R. Kendall. Pursuant to the trust document, the trustees of the trust have the authority to sue and be sued and prosecute and defend any and all actions affecting the trust or its property.

3.      Plaintiff Charles Rice Kendall, co-trustee of the PHT, is an adult individual domiciled in Maine.

4.      Plaintiff Ann P. Hochberg, co-trustee of the PHT, is an adult individual domiciled in Massachusetts.

5.      Upon information and belief, Defendant Alta Marcellus Development, LLC is a Delaware limited liability company with its principal place of business in Texas.

6.      Upon information and belief, Defendant ARD Operating, LLC is a Delaware limited liability company with its principal place of business in Texas. Defendant Alta Marcellus Development, LLC and ARD Operating, LLC are collectively referred to as "Alta."

7.      Upon information and belief, Defendant International Development Corporation ("IDC") is a Pennsylvania corporation with its principal place of business in Pennsylvania.

8.     Upon information and belief, Defendant SWN Production Company, LLC ("SWN"), is a limited liability company whose sole member is Southwestern Energy Company, which is a Delaware corporation with its principal place of business in Texas.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between all Plaintiffs and all Defendants.[1]

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the property that is the subject of the action is situated in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

11.     The PHT is a holder of the interests of the heirs of Thomas E. Proctor ("Proctor"), an entrepreneur in the leather business who died in December 1894.

---

[1] The citizenship of the trustees is utilized for diversity purposes where, as here, the action is brought in the names of the trustees and the trustees have the right to sue and be sued on behalf of the trust. *See, e.g., Navarro Savings Association v. Lee*, 446 U.S. 458, 464-66, 100 S.Ct. 1779, 1783-84 (1980); *Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 201-02 (3d Cir. 2007).

## I.      The Proctor Loyalsock Holdings

12.     As part of his business, prior to October 1894, Proctor was the owner in fee of 44 tracts of land, comprising in excess of 17,000 acres in Lycoming County and Sullivan County, Pennsylvania (the "Premises") that are the subject of this Complaint.

13.     Of the 44 tracts at issue, Proctor owned the entirety of 22 tracts ("Proctor 100% Interest Lands") and an undivided one-quarter interest in the remaining 22 tracts ("Proctor 1/4 Interest Lands").

14.     The Proctor 100% Interest Lands are identified by the following warrant names:

1)   Hugh Lennox, McNett Township, containing 202.25 acres
2)   William Shaw, McNett Township, containing 449 acres
3)   Samuel Dale, McNett Township, containing 522.75 acres
4)   John Bayard, McNett Township, containing 296 acres
5)   Robert Smith, McNett Township, containing 466.72 acres
6)   William Barton, McNett Township, containing 427.8 acres
7)   Stephen Bayard, McNett Township, containing 431.18 acres
8)   Daniel Long, McNett Township, containing 410.86 acres
9)   Aaron Levy, McIntyre Township, containing 367.75 acres
10)  John Singer, McIntyre Township (Arsenal Land Company No. 410), containing 202.75 acres
11)  John Price, McIntyre Township (Arsenal Land Company No. 418), containing 431.29 acres
12)  William Chancellor, McIntyre Township (Arsenal Land Company No. 419), containing 313.22 acres
13)  Walter Stewart, McIntyre Township (Arsenal Land Company No. 427), containing 431.25 acres

14) Robert Shaw, McIntyre Township (Arsenal Land Company No. 428), containing 407.75 acres

15) Samuel Miles Jr., McIntyre Township (Arsenal Land Company No. 434), containing 407.75 acres

16) Jacob Morgan, McIntyre Township (Arsenal Land Company No. 435), containing 407.75 acres

17) William Stewart, McIntyre Township (Arsenal Land Company No. 436), containing 407.75 acres

18) Michael Gratz (Grettz), McIntyre Township (Arsenal Land Company No. 437), containing 521 acres

19) Rowland Perry, Cascade Township, containing 407.75 acres

20) James Reynolds, Cascade Township, containing 407.75 acres

21) William James, Gamble Township, containing 462 acres

22) Michael Hillegas, Fox Township, Sullivan County, containing 39 acres

15.     The Proctor 1/4 Interest Lands are identified by the following warrant names:

1) Josiah Harmer, Cascade and McNett Townships, containing 423 gross acres

2) Mary Garity, Cascade and McNett Townships, containing 432 gross acres

3) Daniel Delaney, Cascade and McNett Townships, containing 407.75 gross acres

4) David George, McIntyre Township, containing 407.75 gross acres

5) Peter Miller, Cascade Township, containing 407.75 gross acres

6) Thomas George, Cascade Township, containing 439 gross acres

7) George Barclay, Cascade Township, containing 483 gross acres

8) George Tudor, Cascade Township, containing 407.75 gross acres

9) Joseph Thomas, Cascade Township, containing 407.75 gross acres

10) Joseph Fox, Cascade Township, containing 407.75 gross acres

11)  Jonathan Supple, Cascade Township, containing 378 gross acres

12)  Robert Rankin, Cascade and McIntyre Townships, containing 427 gross acres

13)  Algernon Roberts, McIntyre Township, containing 407.75 gross acres

14)  Edward George, Cascade Township, containing 407.75 gross acres

15)  John Hawkins, Cascade Townships, containing 407.75 gross acres

16)  William Lewis, Cascade and McNett Townships, containing 470 gross acres

17)  Sampson Levy, Cascade Township, containing 407.75 gross acres

18)  Clement Biddle, Cascade Township, containing 407.75 gross acres

19)  Edward Tilgham, Cascade Township, containing 407.75 gross acres

20)  Benjamin Smith, Cascade and McNett Townships, containing 439 gross acres

21)  Jonathan Mifflin, Plunketts Creek Township, containing 407.75 gross acres

22)  William Rawle, Cascade Township, containing 414 gross acres

16.     By deed dated October 2, 1894 (the "Elk Tanning Deed"), Thomas E. Proctor and his wife Emma H. Proctor, conveyed the surface estate of the entirety of Proctor's properties situated in Lycoming County and portions of Proctor's properties situated in Sullivan County, including the Premises, to the Elk Tanning Company excepting and reserving (hereinafter, "the Proctor Reservation") unto Proctor, his heirs and assigns "all the natural gas, coal, coal oil, petroleum, marble and all minerals of every kind and character in, upon, or under the said land…."

6

17.     The Elk Tanning Deed was recorded in Lycoming County Deed Book 144 at page 398.

18.     Through the Proctor Reservation in the Elk Tanning Deed, Proctor reserved unto himself and his heirs the subsurface estate of the Premises ("the Subsurface Estate").

19.     Shortly after conveying the surface estate of the Premises to Elk Tanning, Thomas E. Proctor died in December 1894, leaving the Subsurface Estate to his heirs.

20.     Proctor's will was registered with the Lycoming County Register of Wills on September 17, 1895 in Will Book 8, Page 253.

## II.     Elk Tanning Becomes a Cotenant of the Proctor Subsurface Estate for the Proctor 1/4 Interest Lands

21.     After acquiring the surface estate of the Proctor 1/4 Interest Lands, Elk Tanning acquired the remaining 3/4 interest, including a 3/4 interest in the subsurface estate, in those 22 tracts.

22.     Following this transaction, Elk Tanning owned 100% of the interest in the surface estate and an undivided three-quarter (3/4) interest in the subsurface estate for the Proctor 1/4 Interest Lands.

23.     Following Elk Tanning's acquisition of the undivided 3/4 interest of these 22 tracts, the Proctor heirs and Elk Tanning were co-tenants of the Subsurface Estate of the Proctor 1/4 Interest Lands.

### III.   The Subsurface Estate Was Reported to the County Commissioners

24.     Under the Act of March 28, 1806, P.L. 644, the grantee to a deed severing the surface from the subsurface had the duty to report its ownership interest to the county commissioners. *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 372 (2016).

25.     This reporting pursuant to the Act of March 28, 1806, P.L. 644 occurred at the County level, not the township level.

26.     Proctor's (and his heirs') interest in the Subsurface Estate was reported to the Lycoming County Commissioners pursuant to the Act of March 28, 1806, P.L. 644.

27.     Lycoming County assessment records for the early 1890s contain entries indicating that Proctor was listed as the owner of various warrants comprising the Premises along with several other warrants contained in the Elk Tanning Deed.

28.     Following its purchase of the surface estate of Proctor's lands, including the Premises, Elk Tanning notified the Lycoming County Commissioners of its interest in the properties pursuant to the Act of March 28,

8

1806, P.L. 644, and Elk Tanning Company paid taxes assessed against the surface estate of the properties.

29.    The assessment records reflect the change in ownership from Proctor to "Elk Tanning Co." following the sale in 1894.

30.    The Act of 1806 required that the County Commissioners assess four times the amount of the tax that would otherwise have been due where the holder of the unseated land has failed to register.  No such four-fold taxation appears in the assessment records for any of the Warrants within the Premises, demonstrating that the land was registered.

## IV.    The Central Pennsylvania Lumber Company's Interest in the Surface Estate Was Reported to the County Commissioners

31.    By deed dated May 25, 1903 (the "Elk-CPLC Deed"), the Elk Tanning Company conveyed certain interests with respect to the Premises to the Central Pennsylvania Lumber Company ("CPLC").   The Elk-CPLC Deed was recorded at Lycoming County Deed Book 183 at page 328.

32.    The Elk-CPLC Deed provides as follows:

Reserving and excepting, nonetheless, unto the party of the first part, its successors, and assigns, all the hemlock bark, rock oak bark and chestnut oak bark upon said lands, timber and trees, with the rights of ingress, egress and regress for the purpose of cutting, peeling, curing, piling, storing and removing said bark in the usual and ordinary manner at any and all times within the period of twenty-five (25) years from the date hereof . . . .

9

33.    The Elk-CPLC Deed further provides:

This deed is made, executed, delivered, and accepted for the purpose
of vesting in the party of the second part, its successors and assigns,
all the right, title, interest and estate but no greater than is now held
and owned by the Elk Tanning Company of, in, and to the lands
hereinbefore mentioned and the timber, trees and wood thereon,
SUBJECT to all the exceptions, reservations, covenants, stipulations,
agreements and conditions continued in the recent deeds hereinbefore
recited, and subject also to all the exceptions, reservations, covenants,
stipulations, agreements and conditions hereinbefore stated. . .

34.    After acquiring Elk Tanning's 3/4 interest in the Proctor 1/4 Interest

Lands, CPLC and the Proctor heirs were cotenants of the Subsurface Estate for

those 22 tracts of land.

35.    Upon becoming the holder of the properties, CPLC had to report its

ownership interest to the County Commissioners.

36.    After its purchase of Elk Tanning's interests in the Premises, CPLC

notified the Lycoming County Commissioners of its interest in the properties, and

paid taxes assessed against the Premises.

37.    Lycoming County assessment records contain entries indicating that

the "C.P.L.Co." was listed as the owner of the various warrants comprising the

Premises along with several other warrants contained in the Elk-CPLC Deed.

38.    The Act of 1806 required that the County Commissioners assess four

times the amount of the tax that would otherwise have been due where the holder

of the unseated land has failed to register.  *See* Act of March 28, 1806, P.L. 644.

10

No such four-fold taxation appears for any of the Warrants at issue in the

assessment records, demonstrating that the land was registered.

### A. Separate Assessments of the Proctor Subsurface Estate in McIntyre and McNett Townships Confirm Reporting to the County Commissioners

39.     Beginning no later than 1905, the assessment records for McIntyre

Township contain separate assessments of the Subsurface Estate on 23 tracts of

land and lists the owners as "Emma E. Proctor, James Proctor, Thomas Proctor and

others. Owners of the Heirs named 23 tracts of unseated lands, Mineral Rights."

40.     The preamble to the assessment states:

> The following tracts of land are assessed to the undersigned as owners
> of 1905 all coal, ores, oils, salt, water minerals, quarrying stone,
> marble on, in, and under the tracts of unseated lands situate on, in, and
> under the tracts of unseated lands situated in McIntyre Township for
> description of reserve of all minerals Refer to Recorders Office of
> Lycoming County in Deed Book 144 page 398.

41.     The Deed recorded in the Lycoming County deed records at volume

144, page 398, conveys the surface estate of the entirety of Proctor's property in

Lycoming County, including the Premises, from Proctor to Elk Tanning, and

contains the Proctor Reservation that applies to all tracts of land subject to the

deed.

42.     In 1908 and 1909, the County assessment records reflect that McNett Township separately assessed the Subsurface Estate on six warrants identifying the owner as "T.E. Proctor Est."

43.     In 1910, the assessment records for McNett Township contain separate assessments of the Subsurface Estate on six Warrants identified as "Estate of Thos. E. Proctor Mineral Rights."

44.     The corresponding surface assessments of the 29 tracts identified in the McInytre and McNett assessment records do not contain any qualifier identifying the assessments as "surface only" assessments despite those properties clearly being assessed as only the fee interest in the surface.

45.     For example, the 1905 assessment for the John Singer Warrant in McIntyre township lists the owner as "Central Pa. Lbr. Co." on the unseated list, but does not state that the assessment is for the "surface only."  The John Singer Warrant appears again under a separate assessment of the Subsurface Estate.

**B.     Unlike Other Townships, McIntyre and McNett Townships Had a Basis to Make Separate Assessments of the Subsurface Estate.**

46.     The assessment of the Subsurface Estate for 29 tracts in McIntyre and McNett were based on actual production of coal and other minerals in those townships.

47.     During the time period of 1905-1910, there was known coal production in portions of McIntyre and McNett townships.

48.     During the time period of 1905-1910, in the townships where the remainder of the Premises is located, Cascade, Plunketts Creek or Gamble Townships, there was no production of coal or other minerals.

49.     Except for the separately assessed warrants, there was no oil or gas production in Lycoming County in or near the Premises prior to 1928.

50.     The Proctor heirs monitored and paid the taxes assessed on their reserved subsurface rights and the Lycoming County Treasurer knew how to contact the Proctor heirs.

## V.     CPLC's Tax Sales of the Surface Estate

51.     Between 1908 and 1928, CPLC allowed hundreds of its properties to be sold at tax sales.

52.     With respect to the Premises, CPLC allowed 39 of the 44 tracts to go through a tax sale between 1908 and 1928.

53.     For the 39 properties within the Premises that went through tax sales, CPLC had its agents and attorneys, Calvin H. McCauley, Jr. and A.F. Jones, purchase the tracts at the tax sales, assuring that CPLC never put its properties at risk.

54.     At the time of the tax sales, CPLC was the owner of the assessed properties.

55.    As the owner of the properties, CPLC had the duty to pay the taxes assessed on the properties.

56.    Pursuant to the Act of June 6, 1887, CPLC had the duty to pay the taxes assessed on the properties.

57.    CPLC failed to pay the taxes assessed on 39 properties within the Premises.

58.    The CPLC properties that went through tax sales between 1908 and 1928 were purchased by McCauley or Jones.

59.    McCauley and Jones quitclaimed the properties they purportedly purchased at tax sales back to CPLC.

60.    CPLC continued to pay taxes for the properties that went through the McCauley and Jones tax sales during the two-year redemption period and afterward.

61.    Upon information and belief, the tax payments made by CPLC exceeded the amount necessary to redeem the properties.

**A.    No Sale Properties.**

62.    The following five warrants at issue in this case did not go through a tax sale during CPLC's ownership of the surface estate of the warrant (the "No Sale Properties"):

    1)    Josiah Harmer

14

    2)    Peter Miller
    3)    Mary Garity
    4)    Daniel Delaney
    5)    Michael Hillegas (portion located in Fox Township, Sullivan County)

63.    Because no tax sale occurred with respect to the No Sale Properties, the Proctor heirs owned the Subsurface Estate with respect to the No Sale Properties at the time of CPLC's sale of the Premises.

**B.    Separately Assessed Properties.**

64.    Of the 39 tracts that did proceed through a McCauley or Jones tax sale, the following 10 tracts had a separate assessment of the Proctor Subsurface Estate (the "Separately Assessed Properties"):

    1)    David George
    2)    John Singer
    3)    John Price
    4)    William Chancellor
    5)    Walter Stewart
    6)    Robert Shaw
    7)    Samuel Miles Jr.
    8)    Jacob Morgan
    9)    William Stewart
    10)    Michael Gratz

65.    Because the Subsurface Estate was separately assessed, the tax sales of the Separately Assessed Properties did not encompass the Subsurface Estate of the Separately Assessed Properties.

66.    The McCauley and Jones tax sales did not alter the Proctor heirs' title to the Separately Assessed Properties.

67.    Following the McCauley and Jones tax sales and at the time CPLC sold the Premises, the Proctor heirs held title to the Subsurface Estate of the Separately Assessed Properties.

### C.    Cotenant Properties.

68.    Of the 39 tracts that proceeded through a McCauley or Jones tax sale, CPLC and the Proctor heirs owned as cotenants the Subsurface Estate of the following 17 tracts (the "Cotenant Properties"):

1) Benjamin Smith
2) William Lewis
3) Robert Rankin
4) Joseph Thomas
5) George Barclay
6) Thomas George
7) William Rawle
8) Clement Biddle
9) Joseph Fox
10) Edward George
11) John Hawkins
12) Edward Tilghman
13) George Tudor
14) Sampson Levy
15) Jonathan Mifflin
16) Jonathan Supple
17) Algernon Roberts

69.     Because an owner of land cannot acquire tax title adverse to his co-tenants, the tax sales of the 17 tracts comprising the Cotenant Properties did not alter the Proctor heirs title to the Subsurface Estate of the Cotenant Properties.

70.     Following the McCauley and Jones tax sales and at the time CPLC sold the Premises, the Proctor heirs held title to the undivided 1/4 interest of the Subsurface Estate of the Cotenant Properties.

**D.      Unassessed Properties.**

71.     CPLC allowed its surface estate of the following 12 warrants to go through a tax sale in which Proctor owned the entirety of the Subsurface Estate, but for which there was no production of oil, gas or coal to allow for a separate assessment of the subsurface (the "Unassessed Properties"):

1)     William James
2)     Samuel Dale
3)     William Shaw
4)     William Barton
5)     Robert Smith
6)     Stephen Bayard
7)     Daniel Long
8)     Hugh Lennox
9)     Rowland Perry
10)    James Reynolds
11)    Aaron Levy
12)    John Bayard

72.     Because CPLC correctly reported its interest in the surface estate only of the Unassessed Properties, any taxes assessed in the name of CPLC encompassed only the surface estate and not the Subsurface Estate.

73.     Because the Proctor Subsurface Estate was reported to the Lycoming County Commissioners, as reflected in the assessment records' reference to the Elk Deed Reservation, the purported tax sales of the Unassessed Properties did not encompass the Proctor Subsurface Estate.

74.     Because CPLC had the duty to accurately report its interest in the surface estate only of the Unassessed Properties, it could not benefit from any breach of that duty to report.

75.     Because CPLC had the duty to pay taxes on the properties it owned, it could not benefit from any breach of that duty to pay taxes.

76.     Additionally, CPLC constructed improvements, including a tannery, buildings and railroads, on the Aaron Levy, Hugh Lennox, William Shaw, Samuel Dale, Robert Rankin, and George Barclay warrants, among others, and such improvements seated the entirety of those tracts, preventing any sale of those warrants as unseated lands.

77.     Upon information and belief, CPLC operated on other warrants within the Premises rendering those tracts seated.

78.     The McCauley and Jones tax sales and tax deeds did not affect the title of the Proctor heirs because the alleged outstanding taxes on the subject properties were paid by an agent of CPLC, which effectuates a "redemption" under the law and confirms ownership of the Proctor Subsurface Estate by the Proctor heirs.

79.     The McCauley and Jones tax sales and tax deeds did not affect the title of the Proctor heirs because the Proctor heirs did not receive notice and an opportunity to be heard.

80.     The McCauley and Jones tax sales and tax deeds did not affect the title of the Proctor heirs because the Tax Deeds were the product of fraud.

81.     The McCauley and Jones tax sales and tax deeds did not affect the title of the Proctor heirs because the interest, right and title of the heirs of Thomas E. Proctor was severed approximately fourteen years prior to the Tax Sales and reported to the assessor.

82.     CPLC and its agents are estopped from acquiring a greater interest in the property as a result of CPLC's own failure to register its ownership of the surface estate to the taxing authorities and failure to pay the assessed taxes.

83.     CPLC, and all of its successors in interest, are estopped from claiming that the assessment of taxes included the Proctor Subsurface Estate as CPLC had

the obligation to register its ownership of the property less the Proctor Subsurface Estate.

84.     Because CPLC, McCauley and Jones, as CPLC's agents, were not bona fide purchasers at the time of the tax sales and subsequent quit claim deeds, they and any parties who claim through them, could not acquire a greater interest in the property as a result of CPLC's own failure to report its interest or pay the assessed taxes.

85.     The tax sales were void, invalid, and passed no title to the Proctor Subsurface Estate, because the notice provisions of the Act of 1815, on their face or as applied, violate the due process rights of the Proctor heirs as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

86.     Following the McCauley and Jones tax sales and at the time of CPLC's sale of the Premises, the Proctor heirs owned the Subsurface Estate of the Unassessed Properties.

## VI.    The Commonwealth's Purchase of the Surface Estate

87.     In 1933, the Commonwealth of Pennsylvania, through its Department of Forests and Waters, purchased the surface estate of the Premises and several other properties owned by CPLC.

88.     The deed from CPLC to the Commonwealth provides that it is subject to the reservations of the various deeds into CPLC, including the Proctor Reservation.

89.     Specifically, the deed states:

Excepting and reserving however, to the Grantors in the following deeds, and to their heirs and assigns, any rights and interests presently held as fully as reserved therein:  From Thomas E. Proctor to the Elk Tanning Company dated October 2, 1894, and recorded in Lycoming County in Deed Book 144, page 398….

90.     The deed also created a new reservation in favor of CPLC, excepting and reserving unto itself any oil, coal and gas then owned by CPLC.

91.     With respect to the Premises, at the time of the 1933 sale, CPLC owned only the undivided 3/4 interest in the subsurface of the Proctor 1/4 Interest Lands.

92.     At the time of the 1933 sale, CPLC did not own any interest in the Subsurface Estate of the remaining 22 tracts within the Premises.

93.     Upon information and belief, CPLC owned the oil, coal and gas underneath other tracts subject to the sale that are not at issue in this case.

94.     At the time of the 1933 sale, the Proctor heirs held title to their proportionate share of the Subsurface Estate of the No Sale Properties.

95.     At the time of the 1933 sale, the Proctor heirs held title to the Subsurface Estate of the Separately Assessed Properties.

96.     At the time of the 1933 sale, the Proctor heirs held title to their undivided 1/4 interest in the Subsurface Estate of the Cotenant Properties.

97.     At the time of the 1933 sale, the Proctor heirs held title to the Subsurface Estate of the Unassessed Properties.

98.     Indeed, CPLC's successor in interest and Defendants' predecessor in interest, Clarence Moore, admitted in a legal dispute with the Commonwealth of Pennsylvania that the McCauley and Jones tax sales did not divest the Proctor heirs of the Subsurface Estate.

## VII.   The Tax Sales of CPLC's "Mineral" Interests

99.     Following its purchase of the surface estate of the Premises, the Commonwealth reported its ownership of the surface estate to the Lycoming County and Sullivan County taxing authorities so that the lands would be removed from the tax rolls.

100.    Following this notification, Lycoming County assessed the "mineral rights" of 39 of the 44 tracts contained within the Premises (the "Mineral Rights Assessments").

101.    Lycoming county did not assess the "mineral rights" of the William Barton, William Shaw, Samuel Miles Jr. and Jonathan Mifflin warrants.[2]

_____

[2] Tax deeds were issued with similar warrant names of "Samuel Mills" and "John Mifflin," however, those similar names reflect separate warrant tracts.  The

102.   Sullivan County did not assess the subsurface estate of the Michael

Hillegas warrant, which portion was owned by Proctor.

103.   The Mineral Rights Assessments were made in the name of CPLC.

104.   At the time of the Mineral Rights Assessments, CPLC owned only a

3/4 interest in the Subsurface Estate of 21 of the 39 tracts assessed, the tracts

contained within the Proctor 1/4 Interest Lands.[3]

105.   The Mineral Rights Assessments did not assess the Proctor heirs

interest in the Subsurface Estate.

106.   The taxes assessed to CPLC went unpaid and proceeded to tax sales.

No tax sale purchaser bid on the properties and CPLC's purported interests were

ultimately acquired by the County Commissioners in a series of deeds in 1936 and

1938.

107.   The 1936 and 1938 tax deeds are located in the following Lycoming

County deed books:

| Warrant Name | | | Lycoming County Deed Book |
|---|---|---|---|
| Proctor 100% Lands | | | |
| 1 | John | Bayard | DB 283, P 287 |

Samuel "Miles" warrant borders the Samuel Miles Jr. tract to the north and the
John Mifflin tract borders the Jonathan Mifflin tract to the south.  As noted below,
the tax sales of both of these tracts were redeemed resulting in no change in title.

[3] See Proctor 1/4 Interest Lands in the Mineral Rights Assessments table
below.

| 2 | Stephen | Bayard | DB 283, P 279; DB 283, P 280 |
| 3 | William | Chancellor | DB 283, P 273 |
| 4 | Samuel | Dale | DB 283, P 287-88; DB 305, 584 |
| 5 | Michael | Grettz (Gratz) | DB 283, P 286; DB 283, P 289 |
| 6 | William | James[4] | DB 283, P 285-86 |
| 7 | Hugh | Lennox | DB 283, P 289 |
| 8 | Aaron | Levy | DB 283, P 290 |
| 9 | Daniel | Long | DB 283, P 277; DB 283, P 285 |
| 10 | Jacob | Morgan | DB 283, P 281-82 |
| 11 | Rowland | Perry | DB 283, P 284-85; DB 305, P 586 |
| 12 | John | Price | DB 283, P 284-85 |
| 13 | James | Reynolds | DB 283, P 281; DB 305, P 597 |
| 14 | Robert | Shaw | DB 283, P 284 |
| 15 | John | Singer | DB 283, P 283 |
| 16 | Robert | Smith | DB 283, P 282-83; DB 283, P 274 |
| 17 | Walter | Stewart | DB 283, P 280-81 |
| 18 | William | Stewart | DB 283, 276 |
| | | | |
| **Proctor 1/4 Interest Lands** | | | |
| 1 | George | Barclay | DB 305, P 582 |
| 2 | Clement | Biddle | DB 305, P 582 |
| 3 | Daniel | Delaney | DB 283, P 279; DB 305, P 584 |
| 4 | Joseph | Fox | DB 305, P 585 |
| 5 | Mary | Garity | DB 305, P 581 |
| 6 | David | George | DB 283, P 288-89; DB 305, P 591 |
| 7 | Edward | George | DB 305, P 590 |
| 8 | Thomas | George | DB 283, P 287; DB 305, P 590 |

---

[4] The tax deed incorrectly references James Williams.  The incorrect identification of the warrant name voids a tax sale due to inadequate notice to the owner.  However, because the properties were redeemed, rendering the 1936 and 1938 tax sales without effect on title, Plaintiffs take the conservative approach of identifying the assumed warrant involved.

| 9  | Josiah   | Harmer[5] | DB 305, 589               |
|----|----------|-----------|---------------------------|
| 10 | John     | Hawkins   | DB 305, P 589             |
| 11 | Sampson  | Levy      | DB 305, P 596             |
| 12 | William  | Lewis     | DB 305, P 588             |
| 13 | Peter    | Miller    | DB 305, P 587             |
| 14 | Robert   | Rankin    | DB 305, P 586; DB 283, P 275 |
| 15 | William  | Rawle     | DB 305, P 598             |
| 16 | Algernon | Roberts   | DB 283, P 282             |
| 17 | Benjamin | Smith     | DB 305, P 596             |
| 18 | Jonathan | Supple[6] | DB 305, P 595             |
| 19 | Joseph   | Thomas    | DB 305, P 594             |
| 20 | Edward   | Tilghman  | DB 305, P 594             |
| 21 | George   | Tudor     | DB 305, P 593             |

108.    An assessment of "minerals" covers only the minerals owned by the person assessed and only to the extent of his ownership.  *See, e.g., New York State Natural Gas Corp. v. Swan-Finch Gas Development Corp.*, 173 F.Supp. 184, 191-92 (W.D. Pa. 1959) (citing Pennsylvania cases).

---

[5] The tax deed incorrectly references Josiah Harmon.  The incorrect identification of the warrant name voids a tax sale due to inadequate notice to the owner.  However, because the properties were redeemed, rendering the 1936 and 1938 tax sales without effect on title, Plaintiffs take the conservative approach of identifying the assumed warrant involved.

[6] The tax deed incorrectly references Jonathan Suppler.  The incorrect identification of the warrant name voids a tax sale due to inadequate notice to the owner.  However, because the properties were redeemed, rendering the 1936 and 1938 tax sales without effect on title, Plaintiffs take the conservative approach of identifying the assumed warrant involved.

109.    Therefore, only CPLC's 3/4 interest in the Proctor 1/4 Interest Lands could have been conveyed by tax sales assessing CPLC's "mineral" interest.

110.    CPLC did not hold any interest in the Subsurface Estate of 18 of the 39 tracts subject to the Mineral Rights Assessments, the tracts contained within the Proctor 100% Lands.[7]

111.    In the early 1940s, CPLC was liquidated and its assets were distributed to subsidiaries of its parent company United States Leather Company ("US Leather").

112.    As part of the liquidation process, in August 1942, CPLC quitclaimed any interests it may have held in certain properties, including those at issue here, in Lycoming County to subsidiaries of US Leather, including Keystone Tanning & Glue Co. ("Keystone").

113.    On or about October 29, 1943, Keystone quitclaimed the same purported interests to Keta Realty Company, another subsidiary of US Leather which later changed its name to Keta Oil and Gas ("Keta").

---

[7] See Proctor 100% Lands in Mineral Rights Assessments Table.

26

## VIII.  The Proctor Heirs and Keta Redeem the Premises

114.    In December 1949, the Proctor heirs contacted the law firm of Furst, McCormick, Muir & Lynn in Williamsport, Pennsylvania regarding the Proctor Subsurface Estate.

115.    As part of these discussions, C.G. Rice, an heir and representative of the Proctor heirs, discussed with Clay McCormick, redeeming the Premises from the County Commissioners.

116.    The Furst, McCormick firm also represented Keta, a corporate affiliate of CPLC, in connection with the redemption of the Premises.

117.    An agreement was made between the Proctor heirs and Keta that they would jointly redeem the Premises from the County Commissioners.

118.    The Proctor heirs provided $10,000 to the Furst, McCormick law firm to provide its proportionate share of the costs of redemption.

119.    The Furst, McCormick law firm proceeded to redeem the Premises from the County Commissioners.

120.    All of the 1936 and 1938 tax sale deeds are stamped redeemed.

121.    A redemption nullifies the tax sale and the title to the property stands as it existed prior to the tax sale.

122.    Therefore, the 1936 and 1938 tax sales and the resulting deeds do not alter the title to the Subsurface Estate.

123.   Following the redemption of the 1936 and 1938 tax sale deeds, the Proctor heirs own their proportionate share of the Subsurface Estate of the No Sale Properties and the Cotenant Properties.

124.   Specifically, for the 22 tracts within the Premises comprising the Proctor 1/4 Interest Lands, in which CPLC and the Proctor heirs were cotenants, following the redemption of the 1936 and 1938 tax sale deeds, the title to the Subsurface Estate was held as an undivided 1/4 interest to the Proctor heirs and an undivided 3/4 interest to CPLC's successor in interest, Keta.

125.   Following the redemption of the 1936 and 1938 tax sale deeds, the Proctor heirs own the Subsurface Estate of the Separately Assessed Properties.

126.   Following the redemption of the 1936 and 1938 tax sale deeds, the Proctor heirs own the Subsurface Estate of the Unassessed Properties.

127.   Shortly after redeeming the Premises and prior to September 1953, some of the attorneys at the Furst, McCormick law firm became officers of Keta.

128.   In a September 30, 1953 letter to its stockholders regarding its upcoming liquidation, Keta detailed its oil and gas holdings.

129.   In the letter Keta identified that approximately 40,000 acres in Lycoming County went through McCauley and Jones tax sales.  However, after investigation by the Furst, McCormick law firm, Keta only claimed 21,059 acres of oil and gas in Lycoming County as a basis to value Keta's assets in its liquidation.

28

130.   The difference in acreage between the tax sale acreage and the acreage claimed at liquidation corresponds to the acreage held by the Proctor heirs (by deeds maintaining the Proctor Reservation and the lands associated with the redemptions).

131.   Following liquidation, Keta was acquired by Swan-Finch in 1955.

132.   During this time, Lowell Birrell controlled Swan-Finch.

133.   In 1959, Birrell, who had fled the country for Cuba in 1957, was indicted for extensive stock manipulations of the companies he controlled, including Keta.

134.   One of the FBI agents sent to track down Birrell in Cuba was Clarence W. Moore.

135.   In 1956, Moore had founded Consolidated Cuban Petroleum Corporation with Hillel Kook (also known as Peter Bergson).

136.   Following Birrell's manipulation of Keta's records, the assets were liquidated in bankruptcy.

137.   In 1966, the bankruptcy trustee issued a quitclaim deed of any purported oil, gas and mineral interests Keta had to Hillel Kook, and his newly formed Astra Oil & Gas Corporation.

138.   The quitclaim deed from the bankruptcy trustee provides that the trustee "does hereby release and quit-claim to said Grantee, its successors and

assigns, any and all gas, oil and mineral rights which said Grantor may have, but no greater right, title and interest of, in and to such gas, oil and mineral rights than is now held by the said Grantor…." The deed further disclaims any warranty.

139.   Kook's associate, Clarence W. Moore, ultimately obtained the purported Keta oil and gas assets from Astra (then known as KGA Industries) in exchange for work he performed for its executive.

140.   Moore acknowledged in a January 3, 1983 letter to Kenneth Yates regarding "Lycoming County Mineral Rights" that following a bankruptcy, a "trustee conveys only the estate that the bankrupt had, no more" and "does not wipe out other interests."

141.   In an August 8, 1977 letter to General Crude Oil Company, Moore acknowledged that he was not sure what, if any, assets he acquired from the bankruptcy stating in an August 8, 1977 letter to General Crude Oil Co., "I don't know what we have. No one else does."

142.   In connection with litigation commenced against the Commonwealth in the 1980s, Moore stipulated that the Proctor reservation was reported. Specifically, the stipulation provided:

> For each of the relevant years, 1908 through 1926, during which the tax sales of the surface estates took place, the Lycoming County Tax Assessor's records for McIntyre Township (Exhibits H through Z inclusive) contained a written statement by the Tax Assessor acknowledging the reservation

of all minerals in Proctor Deed 144/398 in the following
general form:

For a description of reserve of all minerals refer to Recorders
office of Lycoming County in Deed Book 144 page 398.

143.   For example, Moore admitted that "[f]or the relevant years 1908
through 1926, there were tax sales of the surface estate of [a list of Warrants within
the Premises] for failure to pay taxes assessed against the surface estate."

144.   Furthermore, Moore argued before the Board of Claims and the Board
of Claims found as fact that at the time of the 1933 sale, CPLC did not own the oil
and gas to the Proctor 100% Interest Lands, but instead CPLC had owned only a
3/4 undivided interest in the Proctor 1/4 Interest Lands, in which CPLC and the
Proctor heirs were cotenants.

145.   Defendants all claim their interests in the Premises through Moore.

146.   Upon information and belief, Defendant Alta has begun producing gas
and/or oil from certain tracts within the Premises, including the Rowland Perry,
James Reynolds and George Tudor warrants.

## COUNT I – QUIET TITLE
### (Against all Defendants)

147.   Plaintiffs hereby incorporate by reference the allegations set forth in
the foregoing paragraphs as though fully set forth herein.

Case 1:20-cv-00838-CCC   Document 1   Filed 05/22/20   Page 32 of 38

148.    Plaintiffs seek to quiet title to the oil, gas and mineral rights of the Premises to remove any cloud on their title to the Premises that has been created by Defendants' actions.

149.    Plaintiffs hold title to the natural gas and oil contained in the Premises as set forth above.

150.    There is a cloud on Plaintiffs' title to the oil and gas rights in the Premises due to the actions taken by Defendants.

151.    Defendants have made claims to ownership or have attempted to convey interests in the oil and gas associated with the Premises.

152.    Plaintiffs seek a determination that title to the oil and gas rights of the Premises is vested in them.

## COUNT II – ACTION IN EJECTMENT
### (Against all Defendants)

153.    Plaintiffs hereby incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

154.    Alternatively, if the PHT is determined to be out of possession of the subsurface oil, gas and mineral rights contained within the Premises or portions thereof, the PHT seeks to recover possession of oil, gas and mineral rights underneath the Premises.

155.    The PHT holds title to the oil, gas and mineral rights contained in the Premises as set forth above.

156.   The PHT has the exclusive right to the possession, use, enjoyment and control of the Subsurface Estate of the 22 tracts comprising the Proctor 100% Interest Lands within the Premises.

157.   Defendants have made claims to ownership or have attempted to convey interests in the oil, gas and mineral rights associated with the Premises.

158.   Alta has produced gas from portions of the Premises.

159.   As a result of Alta's unauthorized production of natural gas from the Subsurface Estate of portions of the Proctor 100% Interest Lands, Alta has interfered with the PHT's exclusive right to possession, use, enjoyment and control of the Subsurface Estate of the tracts.

160.   As a result of Defendants' actions, the PHT has lost its ability to fully appreciate the benefits of the natural gas in and under the Subsurface Estate of the Proctor 100% Interest Lands.

161.   Defendants refuse to deliver possession of the oil, gas and mineral rights within the Premises to the PHT.

162.   The PHT demands judgment for possession of the oil, gas and mineral rights underneath the Premises.

## COUNT III – CONVERSION
### (Against all Defendants)

163.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

164.   Upon information and belief, Defendants have intentionally deprived the PHT of its right to the natural gas underlying the Premises through the production and sale of gas from the Premises.

165.   Defendants have permitted or enabled the production of natural gas from the Premises without Plaintiffs' consent and without lawful justification.

166.   The PHT has suffered damages as a result of the unauthorized production and sale of natural gas from the Premises in an amount to be determined at trial.

## COUNT IV - UNJUST ENRICHMENT
### (Against all Defendants)

167.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

168.   Defendants have been unjustly enriched as a result of benefits appropriated from Plaintiffs.

169.   Defendants have received benefits or compensation in connection with the extraction of natural gas from the Premises.

170.   Defendants have appreciated and been enriched by such benefits that rightfully belong to the PHT.

171.   The retention of such benefits by Defendants is inequitable and unjust and has substantially damaged the PHT.

## COUNT V – TRESPASS
### (Against Alta)

172.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

173.   The PHT has the exclusive right to the possession, use, enjoyment and control of the Subsurface Estate of the 22 tracts comprising the Proctor 100% Interest Lands within the Premises.

174.   As a result of Alta's unauthorized production of natural gas from the Subsurface Estate of portions of the Proctor 100% Interest Lands, Alta has interfered with Plaintiffs' exclusive right to possession, use, enjoyment and control of the Subsurface Estate of the tracts.

175.   Alta's production of natural gas from the Subsurface Estate of the Proctor 100% Interest Lands is intentional.

176.   As a result of Alta's unauthorized production of natural gas from the Subsurface Estate of the Proctor 100% Interest Lands, Alta has caused damage to the PHT.

177.   As a result of Alta's actions, the PHT has lost its ability to fully appreciate the benefits of the natural gas in and under the Subsurface Estate of the Proctor 100% Interest Lands.

178.   The PHT has suffered damages as a result of the unauthorized production of natural gas from the Subsurface Estate of the Proctor 100% Interest Lands in an amount to be determined at trial.

## COUNT VI – DECLARATORY JUDGMENT
### (Against all Defendants)

179.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

180.   A dispute exists between Plaintiffs and Defendants as to the ownership of the oil, gas and mineral rights within the Premises.

181.   The PHT claims title to the Subsurface Estate of the Premises.

182.   Upon information and belief, Defendants claim title to or an interest in the Subsurface Estate of the Premises.

183.   An actual controversy exists among the parties as to the ownership of the Subsurface Estate of the Premises.

184.   Plaintiffs seek a declaration that the PHT owns the Subsurface Estate associated with the Premises.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants as follows:

(i)     That the Court enter an order declaring that the PHT is a rightful owner of all the natural gas, coal, oil, petroleum, marble and all minerals of every kind and character in, upon, or under the Premises;

(ii)    That the Court enter judgment against Defendants and in favor of the PHT for all compensatory and punitive damages incurred as a result of Defendants' actions, including, without limitation, the total amount of all benefits which have accrued to Defendants and/or which inured in any manner to Defendants as a result of the production of gas or oil from the Premises;

(iii)   That the Court enter an order requiring Defendants to account to the PHT for any and all compensation, including, without limitation, the total amount of all benefits which have accrued to Defendants and/or which inured in any manner to Defendants as a result of the production of oil, gas or other subsurface interests that has occurred in the Proctor 1/4 Interest Lands.

(iv)    That the Court enter judgment against Defendants for prejudgment interest and costs; and

(v)     That the Court grant such other relief as it shall deem just and equitable under the circumstances.

Plaintiffs demand a jury trial on all claims so triable.

Dated: May 22, 2020                    Respectfully submitted,


                                       */s/ Laura A. Lange*
                                       Laura A. Lange
                                       Pa. Id. No. 310733
                                       1670 Sturbridge Drive
                                       Sewickley, PA 15143
                                       847-800-8334
                                       lange@proctortrust.com

                                       Justin G. Weber (PA 89266)
                                       PEPPER HAMILTON LLP
                                       Suite 200, 100 Market Street
                                       P.O. Box 1181
                                       Harrisburg, PA 17108-1181
                                       717.255.1155
                                       717.238.0575 (fax)
                                       weberjg@pepperlaw.com

                                       *Attorneys for The Trustees of the*
                                       *Thomas E. Proctor Heirs Trust*